[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Pursuant to a May 16, 1994 complaint, the plaintiff Southern New England Telephone Company ("SNET") seeks to recover for sums expended due to the alleged negligence of the defendant Henkels 
McCoy, Inc. ("Henkels McCoy"). Specifically, the one-count complaint alleges, in substance, that Henkels McCoy, a Pennsylvania corporation, replaced certain telephone poles at a location on Poquonock Avenue in Windsor in June 1992, and that in replacing the poles, Henkels McCoy employees negligently damaged a certain conduit structure and underground cables owned by SNET, requiring SNET to fix the damage. SNET alleges in its complaint that Henkels McCoy was negligent in three ways: in that it performed the work in a careless and negligent manner by failing to act with due regard for the presence of underground telephone facilities (paragraph 9a); in that Henkels McCoy failed to exercise reasonable care in violation of Section16-345-4(a)(5) of the Regulations of Connecticut State Agencies (paragraph 9b); and finally, in that Henkels McCoy failed to provide the necessary support and protection of underground telephone facilities that were exposed by the defendant's work, in violation of Section 16-345-4 (a)(6) of the Regulations of Connecticut State Agencies (paragraph 9c).
In its answer of August 1, 1994, Henkels McCoy denied the allegations of negligence contained in paragraph 9 of the complaint.
In its responses to plaintiff's Request for Admission dated February 21, 1995, Henkels McCoy admitted that its agents, servants or employees were boring and/or digging holes upon or near Poquonock Avenue for the purpose of replacing certain telephone poles and denied that its agents, servants or employees exposed underground cables, wires, or telecommunication facilities.
Trial was held before the undersigned judge on April 4, 1996 and April 10, 1996. Post-trial memoranda, and reply memoranda, were then filed by both sides.
Having reviewed the full record, and considered the arguments made by counsel. I have decided that judgment should enter for CT Page 5163-DDDDD plaintiff in the amount of $37,239.35.
Findings of Fact
Plaintiff's witnesses at trial included Barney Honaker, a "locator" with SNET; Raymond Lentocha, a cable maintenance supervisor with SNET; Jill Leforce, an outside network assistant with SNET; and Nancy Pacelli, manager for cost recovery, billing services, with SNET. Defendant called Mark Grubbs, Northeast manager of teledata work with Henkels McCoy. However, he was not permitted to offer expert testimony because he had not been timely disclosed as an expert.
With respect to liability, I find as follows:
Barney Honaker, a SNET employee with 24 years of experience, was a "locator" in June, 1992, responsible for marking out underground cables to ensure that "excavators" don't hit them.[1] Mr. Honaker testified that pursuant to the DPUC regulations, excavators must call to give timely notice of their intention to excavate at or near the location of any public utility underground facilities. In this case, Mr. Honaker received a "call before you dig" ticket on June 1, 1992, indicating that Henkels McCoy intended to replace certain poles on Poquonock Avenue in Windsor, beginning at 9:00 a.m. on June 4, 1992. See Plaintiff's Exhibit 2. On receipt of the ticket, he examined the conduit plates detailing the location of underground cables and then went out to the site. See Plaintiff's Exhibits 3a and 3d. He determined there was underground cable in the vicinity of where Henkels McCoy would be working, went to the site with equipment to locate the cable, and marked the location. Mr. Honaker noted in red on Exhibits 3a and 3b the areas he had marked. He marked the Poquonock Avenue location with orange paint, as required by DPUC regulations, in dotted lines. He did this work on June 2, 1992.
On June 12, 1996, his supervisor informed him that one of the underground cables had been hit and ordered him to again mark the location. On June 12, he went back to the site to remark it. He observed that someone had dug up and covered up the ground in the vicinity of the cable. He took two photos: See Plaintiff's Exhibits 5 and 6. On June 12, he could see the original orange markings he had made on June 2, and saw that the original markings had been disturbed. He drew a red circle around where he saw the markings disturbed on Plaintiff's Exhibit 3b. The CT Page 5163-EEEEE disturbance he saw on June 12 was practically on top of the orange line. He testified that he understood state regulations to require that a contractor must leave 18 inches on each side of the line, and to dig by hand if the distance left is close. Mr. Honaker also testified that he had seen Henkels McCoy setting up poles all week.
Raymond Lentocha, with 28 years of experience at SNET, testified. He has worked as a splicer and a cable repair technician, as well as a cable maintenance supervisor. As a cable maintenance supervisor, he is responsible for locating the sites of cable problems and overseeing repairs of all cable.
On June 2, 1992, at 9:30 a.m., he received a call from the SNET employees who monitor services indicating there was a service outage. He was required to locate the problem, and sent two technicians out. He learned that 48 lines were down. After some inquiries, he learned that a signal was not getting through on Poquonock Avenue in Windsor. He went to the location, where SNET employees were opening up manholes to determine what was wrong.
While at the site, he talked with an unidentified Henkels 
McCoy employee, who told him they'd been working on poles in the area. The Henkels McCoy employee showed him where the poles had been set. The Henkels McCoy employee took him to pole 445, which Mr. Lentocha circled in red on Exhibit 3b. The Henkels 
McCoy employee told him efforts had been made to put the pole in that location. Mr. Lentocha saw that the ground was disturbed and that there was a mound of dirt around the pole. He viewed two poles in the vicinity, one a new one, and determined that both were very close to a SNET underground structure, which ran "about a foot or so" behind the pole. Following this period of investigation, and based on information he received from SNET employees and technicians, he determined he had located the situs of the problem.
A Manchester cable contractor was contacted to assist, and arrived on the afternoon of June 12. The contractor dug by hand to avoid any further damage, the goal being to expose the duct structure. The digging exposed damage — a hole — in the concrete cable casing, as well as a physical hole in a cable. Examination of the subject cables indicated that some were damaged, while others weren't. CT Page 5163-FFFFF
Mr. Lentocha testified that only one duct structure was damaged by what was thought to be the auger drilling a hole for the telephone pole, but all the concrete had to be removed to repair the one damaged duct structure, due to the nature of the damage. A 6 foot by 4 foot hole was dug. The concrete was removed and the outer sheath of the cable was removed. More technicians were needed due to the amount of the work, which required four people to do the needed splicing and repair work. A police officer was also needed, Mr. Lentocha testified. His primary concern was to restore service to customers who had lost service as soon as possible. The repairs performed on June 12 were temporary, so a splice was done. It then took over a year to effectuate permanent repairs. It took that long because other work took first priority.
With reference to Plaintiff's Exhibits 3a and 3b, Mr. Lentocha testified that he believed approximately 890 feet of cable was replaced, from manhole 115 to manhole 114. He testified that 890 feet was reasonable and necessary under the circumstances. Mr. Lentocha stated that the splicing, and later replacement procedures used at Poquonock Avenue were all necessary, reasonable and done in accordance with usual SNET practice. He supervised the work on June 12, 1992, but was not present for any of the cable replacement work done after June 12.
Having considered the evidence as to liability, I find that plaintiff has proven its claims by a preponderance of the evidence.
Henkels McCoy has conceded that its employees were placing utility poles on Poquonock Avenue at approximately 10:00 a.m. on June 12, 1992, at the precise location of the disruption. Mr. Lentocha was led to that location by an employee of Henkels 
McCoy. This was the location identified in the "call-before you dig" ticket, Plaintiff's Exhibit 2, which had been marked with the orange paint sprayed by Mr. Honaker. Mr. Lentocha's testimony also established that he observed personally damage to SNET facilities consistent with an auger mark which had damaged the concrete duct structure housing the conduit and cable. This evidence is essentially uncontroverted.
Having considered all of the evidence and the reasonable inferences drawn from it, and evaluated the credibility of the witnesses. I conclude that SNET has proven its common law claim by a fair preponderance of the evidence. The evidence establishes CT Page 5163-GGGGG that Henkels McCoy failed to use that degree of care which an ordinarily prudent person would have used in its excavation work at Poquonock Avenue. The area in question was clearly marked in orange. Henkels McCoy was thus on notice that care was required in its excavating to avoid damage to the underground cables. Henkels McCoy breached its duty to use reasonable care.Olshefski v. Stenner, 26 Conn. App. 220, 223 (1991).
I also conclude that plaintiff has proven by a preponderance of the evidence that Henkels McCoy violated DPUC regulations16-345-4 (a)(5). A violation of a valid administrative regulation is negligence per se. Heritage Village Master Association v.Heritage Village Water Company, 30 Conn. App. 693, 705 (1993).
A preponderance of the evidence also indicates that Henkels 
McCoy failed to exercise reasonable care when working in proximity to SNET's underground telephone facilities, in violation of 16-345-4 (a)(5), in that Henkels McCoy's employees (1) failed to use construction methods appropriate to ensure the integrity of existing utility facilities; and (2) failed to select equipment capable of performing the work with the minimum reasonable likelihood of disturbance to underground facilities.[2]
See paragraph 9b of the complaint.
A preponderance of the evidence indicates as well that plaintiff failed to provide such support or protection of the underground telephone facilities that were likely to be exposed by excavating in violation of Section 16-345-4 (a)(6).[3] See paragraph 9c of the complaint.
DAMAGES
As a general matter, the burden of proving all damages sought rests on the party claiming them. Garganol v. Heyman, 203 Conn. 616,620 (1987). A party is entitled to recover all damages proximately caused by the negligence of another, if proven by a preponderance of the evidence, whether or not the consequences were reasonably anticipated. Neiditz v. Mortin S. Fine Associates, Inc., 199 Conn. 683 (1986). However, damages may not be based on speculation, conjecture, or sympathy. While mathematical exactitude is often impossible when proving damages, the plaintiff bears the burden of providing sufficient evidence for the trier to make a fair and reasonable approximation.
Where a market value cannot be ascertained, the proper CT Page 5163-HHHHH measure of damages is the reasonable cost of repairs necessary to restore damaged property to its former condition. Whitman HotelCorporation v. Elliot Watrous Engineering Co., 137 Conn. 562,573 (1951). See also Wisconsin Telephone Co. v. Reynolds,87 N.W.2d 285, 289 (1958). The court has broad discretion in determining damages. Buckman v. Peoples Express, Inc., 205 Conn. 166
(1987).
Having considered the trial briefs and reply briefs submitted by the parties, I am persuaded that, with the significant exception noted below, plaintiff has proven all elements of damages claimed by a preponderance of the evidence with respect to both Work Order 88062 and Work Order B5091. The testimony of plaintiffs witnesses established by a preponderance of the evidence that the costs incurred — putting aside "corporate expense loading" — were incurred to repair and replace conduit and underground cable at the site. Plaintiff's Exhibit B. The evidence indicates that the construction labor, material-repair, and contract voucher expenses were all reasonable and necessary expenses, with respect to both work orders. The evidence also indicates that the credit for used life of damaged cable and junk salvage were also reasonably arrived at. Defendant offered no persuasive critique of the amounts claimed at trial and a number of its damages arguments are based on speculative renderings of the evidence. Nor did defendant provide any evidence that the amounts claimed were unreasonable, unnecessary, or excessive. I conclude that the amounts claimed in both work orders are supported by the testimony of plaintiff's witnesses, and the evidence introduced at trial. See Plaintiff's Exhibits 9-23.
Indirect Overhead Costs/Corporate Expense Loading
Plaintiff's claim for damages includes a claim for certain "indirect costs." Acknowledging the decision in Hartford ElectricLight Company v. Board, 3 Conn. Cir.Ct. 323 (1965), defendant concedes, see Reply Brief of the Defendant dated May 15, 1996, at pages 9-10, that certain indirect overhead costs are recoverable as damages. These include vacation time, short term illness, supervision, clerical staff and administrative overhead. I agree.
However, defendant disputes plaintiff's claims for "corporate expense loading" — overhead amounts relating to such departments as finance and accounting, human resources, external affairs and legal affairs, according to the testimony of Nancy Pacelli. Ms. Pacelli, an employee with 23 years of experience at SNET, and CT Page 5163-IIIII manager of cost recovery billing, testified that "corporation expense loading" is computed on a pro-rata basis based on the number of productive hours worked by SNET employees and the total costs of those departments. See Transcript of Testimony of Nancy Pacelli, April 4, 1996, at pages 172-173; 242-243.
Having considered this matter, I agree with defendant that in the absence of testimony that items attributable to "corporate expense loading" bore some direct relation to the injuries suffered in this case, such amounts are not proper items of damage. I do not believe the cases plaintiff relies upon —Hartford Electric Light Company v. Beard, 3 Conn. Cir.Ct. 323 (1965), Wisconsin Telephone Co. v. Reynolds, 2 Wis.2d 649,87 N.W.2d 285 (1985), or Warren Telephone Co. v. Hakala, 105 Ohio App. 459,152 N.E.2d 718 (CT. App. 1957) — suggest a different conclusion. These cases — all involving very modest claims for "indirect costs" — stand for the proposition, among other things, that certain "indirect costs" of repairs are proper elements of damage. These items appear to have been clearly established and to bear some relation to the damage asserted — e.g., they would not have been incurred but for the damage. Moreover, the minimal amounts claimed as "indirect costs" in these cases are not disproportionate to the direct costs incurred. I do not read these cases to stand for the broad proposition put forth by plaintiff that all indirect costs — including the more than $11,000 in "corporate expense loading" items claimed in this case — are necessarily proper elements of damage. In the absence of clear authority from our appellate courts holding that "corporate expense loading" is an appropriate item of damages in circumstances such as those present here, I conclude that its relationship to the harm caused is too indirect and too attenuated to permit it to be assessed against Henkels McCoy. To phrase it differently, the evidence produced at trial failed to prove that the significant claimed amounts for "corporate expense loading" would not have been incurred even if the alleged negligence of Henkels McCoy had never occurred.[4] Moreover, even if such "corporate expense loading items" were considered appropriate damages, I do not believe plaintiff proved by a preponderance of the evidence that they were computed and applied in accordance with "sound accounting principles based on the experience of the company over a long period of time." HartfordElectric Light Co. v. Beard, supra, at 325. Despite her experience and expertise, Ms. Pacelli is not an accountant. Moreover, there was insufficient testimony or evidence indicating that the substantial amounts claimed for "corporate expense CT Page 5163-JJJJJ loading" were ascertained based on SNET's experience over a long period of time.
I accept the analysis provided by defendant in its June 18, 1996 compliance with my order dated June 6, 1996. Consequently, I conclude that, with respect to Work Order 88062, a total of $1,007.28 of the $5,229.16 claimed is attributable to "corporate expense loading." I therefore conclude that as to this work order, damages in the amount of $4,221.88 should be awarded.
With respect to Work Order B5091, I also accept the analysis put forth by defendant, in its June 18, 1996 compliance. I therefore conclude that as to Work Order B5091, the amount of "corporate expense loading" equals $10,262.94, and that damages in the amount of $33,017.47 should be awarded.
Consequently, damages should be awarded in the total amount of $37,239.35.[5]
With respect to statutory interest, the court in allowing such interest is making an equitable determination within its discretion in view of the demands of justice. No arbitrary rule apples. Scribner v. O'Brien. Inc., 169 Conn. 389 (1974); Bertozziv. McCarthy, 164 Conn. 463, 466-67 (1973). Whether or not an award of interest is made depends on whether the detention of money is wrongful under all of the circumstances. Marcus v.Marcus, 175 Com. 138, 146 (1978).
In this case, I am unable to conclude that defendant's detention of money was "wrongful" given the circumstances of this case. To be sure, defendant has benefitted [benefited] from the use of the money it is now being ordered to pay in this case. But a bonafide dispute existed as to whether defendant was responsible for the harm in this case. Defendant was entitled to put SNET to its proof, and now has. Moreover, with respect to the amounts owed, as the bill prepared by plaintiff (Plaintiff's Exhibit 13) makes clear, the amounts claimed have not been entirely free from ambiguity — witness the dispute over "corporate expense loading." Consequently, I cannot conclude that defendant "wrongfully detained" disputed sums in this case and therefore conclude that an award of interest is not warranted.
Therefore, for the reasons stated above, judgment shall enter for plaintiff in the amount of $37,239.35. CT Page 5163-KKKKK
Douglas S. Lavine, Judge, Superior Court